UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BLUE SAGE CONSULTING, INC.,
    Plaintiff,

v.

FAILSAFE AIR SAFETY SYSTEMS CORP.,
    Defendant.

CIVIL ACTION NO. 05 11483 NG

RECEIPT # _____
AMOUNT $ 250.00
SUMMONS ISSUED 1
LOCAL RULE 4.1 ✓
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. M.P.
DATE 7/13/2005

MAGISTRATE JUDGE MBB

**COMPLAINT AND JURY DEMAND**

The Plaintiff, BLUE SAGE CONSULTING, INC., by and through its attorneys, The Law Office of Robert N. Wilson, Jr., alleges as follows:

**PARTIES**

1) The Plaintiff, Blue Sage Consulting, Inc. (hereinafter, "Blue Sage"), at all times material to the complaint, is a Massachusetts Corporation with a principal place of business at 6 Hearthstone Road, Hopkinton, Massachusetts 01748.

2) The Defendant, Failsafe Air Safety Systems Corporation (hereinafter, "FASS"), at all times material to the complaint, is a Delaware Corporation with a principal place of business at 79 Fillmore Avenue, Tonawanda, New York 14150.

## JURISDICTION

3) Jurisdiction over this claim is based upon diversity of citizenship and a case and controversy in excess of $100,000.00.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

4) The parties executed a written Contractor Agreement (the "Agreement", Attached as Exhibit A) effective September 23, 2002 through September 23, 2007. The Agreement stated the parties would work together, with Blue Sage providing "marketing, communications, [and] consulting project management services."

5) In Turn FASS agreed to: (1) "reimburse the Contractor for reasonable and customary out-of-pocket expenses"; (2) "pay the Contractor a fee at the rate of Seven Thousand Five Hundred Dollars ($7,500) per month"; (3) pay a "finance charge equal to one and one-half percent (1½%) per month on all amounts not paid when due (including reasonable attorney's fees) incurred in collecting any unpaid amounts"; and (4) compensate the Contractor by paying "a vested portion of a total of Five Percent (5%) of the common capital stock" of FASS.

6) The Agreement was executed by the principals of FASS and Blue Sage, and was negotiated and signed in the Commonwealth of Massachusetts.

7) The terms of the Agreement stated Blue Sage was at all times "an independent contractor…and not a co-venturer, agent, employee or representative of [FASS]" and that "no act, action or omission to act of [Blue Sage] shall in any way be binding upon or obligate [FASS]."

8) From September 23, 2002 through September 23, 2003 Blue Sage performed in accordance with the terms of the Agreement.

9) From September 23, 2002 until September 23, 2003 Blue Sage provided monthly statements for services rendered to FASS as agreed by the parties under the Agreement.

10) From September 23, 2002 until September 2003 Blue Sage was not paid for professional services rendered, interest on amounts due but not paid, and was not awarded any equity in FASS as required under the Agreement.

11) From September 23, 2003 until August of 2004 FASS paid Blue Sage the sum of $7,500.00 per month for consulting services performed during that period.

12) Blue Sage was not paid for consulting work completed prior to September 23, 2003, nor was Blue Sage paid interest on the unpaid fees in accordance with the terms of the Agreement.

13) In September of 2004 Blue Sage terminated the business relationship between FASS and Blue Sage in accordance with the terms of the Agreement. (See Exhibit B)

14) To date, Blue Sage has not been paid for the consulting services performed from September 23, 2002 to September 23, 2003, in spite of an agreement to do so.

15) To date, Blue Sage has not been awarded stock due pursuant to the Agreement.

## COUNT 1

### BREACH OF CONTRACT

16) Blue Sage reasserts and realleges paragraphs 1 through 15 as if fully set forth herein.

17) Blue Sage fully performed its obligations in accordance with the terms of the Agreement from September 23, 2002 to September 23, 2003.

18) FASS breached their obligations under the Agreement by: (1) their failure to pay the Blue Sage a fee of Seven Thousand Five Hundred Dollars ($7,500) per

     month for the period from September 23, 2002 through September 23, 2003; (2) their failure to pay a finance charge equal to one and one-half percent (1½%) per month on all amounts not paid when due; and (3) by their failure to compensate Blue Sage by paying a vested portion of a total of Five Percent (5%) of the common capital stock of FASS.

19) Upon information and belief, Blue Sage is owed the sum of $7,500.00 per month from September 23, 2002 to September 23, 2003 for work performed and billed to FASS, said damages amounting to the sum of $97,500.00, plus compounded interest in the amount of $60,540.00.

20) Upon information and belief, Blue Sage is entitled to common capital stock totaling five (5%) percent of the equity stake of FASS, valued in excess of $1,250,000.00 based on the company's published valuation of $25,000,000 as of August 2004.

## COUNT 2

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

21) Blue Sage reasserts and realleges paragraphs 1 through 20 as if fully set forth herein.

22) FASS entered into an Agreement with Blue Sage under which it agreed to pay Blue Sage fees for consulting work performed, grant Blue Sage common capital stock, and pay interest on any unpaid consulting fees.

23) Every such Agreement contains the covenant that a party will deal with the other party in good faith, honest belief, with an absence of malice and the design to defraud or seek an unconscionable advantage.

24) At all time Blue Sage has abided by this covenant in its performance under the Agreement and in its dealings with FASS.

25) Upon information and belief FASS has breached the implied covenant of good faith and fair dealing by its failure to pay fees for consulting work performed and interest on unpaid fees for work performed from September 23, 2002 to September 23, 2003, and by its failure to provide Blue Sage with common capital stock.

WHEREFORE, BLUE SAGE demands that this Honorable Court or Jury award Blue Sage damages and relief as follows:

A) $97,500.00 in unpaid consulting fees for work performed under the Agreement;

B) $60,540.00 in interest on unpaid consulting fees as required under the Agreement;

C) Common capital stock totaling five (5) percent of the equity stake of FASS, which is, upon information and belief, valued in excess of $1,250,000.00.

D) Pre- and post-judgment interest, attorney fees and costs; and,

E) Whatever other relief that this Honorable Court or Jury deems just.

THE PLAINTIFF ALSO DEMANDS A JURY TRIAL ON ALL ISSUES.

Respectfully submitted,

Blue Sage Consulting, Inc.,

By its Attorneys,

_____
Robert N. Wilson, Jr., Esquire
LAW OFFICES OF ROBERT N. WILSON, JR.
BBO #: 558374
46 Washington Street
Post Office Box 633
Ayer MA  01432-0633
(978)772-9014
atty@wilsonatlaw.com

Dated: July 11, 2005

EXHIBIT A

Contractor Agreement

This CONTRACTOR AGREEMENT (the "Agreement") is made and entered into as of the 30th day of September, 2003, provided, however, it is effective as of September 23, 2002 (the "Effective Date") by and between BLUE SAGE CONSULTING, INC. (the "Contractor"), a Massachusetts corporation, with its principal place of business care of P.O. Box 554, Hopkinton, MA 01748 and FAILSAFE AIR SAFETY SYSTEMS, CORP., a Delaware corporation, with its principal place of business at 79 Fillmore Ave., Tonawanda, NY 14150 (the "Client"). This Agreement sets forth the terms and conditions of the Contractor Agreement by and between the Contractor and the Client.

WHEREAS, the Contractor has been providing consulting services to the Client since September 23, 2002 pursuant to certain writings, namely a proposal and memorandum of understanding;

WHEREAS, while the parties hereto intended to enter into a written agreement based upon the proposal and memorandum of understanding they never did so and the Contractor has served the Client for One (1) year as of September 23, 2003;

WHEREAS, the parties hereto intend the Effective Date of this Agreement to be September 23, 2002, and not the date of the execution of this Agreement;

WHEREAS, notwithstanding the lack of a written agreement the parties proceeded on an unwritten and oral contract basis under which the Contractor in good faith and relying on receiving a written agreement and financial compensation rendered a broad range of highly valuable marketing, operations, sales, management and communications consulting services for the Client, which said consulting services were performed to the Client's complete satisfaction and approval to date;

WHEREAS, Contractor has not been compensated and has not received stock, cash or any other compensation for its consulting services during the period September 23, 2002 to September 23, 2003; although Contractor has been reimbursed for some of its accrued expenses;

WHEREAS, the Contractor desires to continue providing its consulting services, as more fully described below, for a term of four (4) years and the Client desires to have the Contractor do so; and

WHEREAS, the parties hereto recognize that in order for the Contractor to be able to continue serving the Client it is absolutely necessary to do the following: (i) put their agreement in writing; (ii) have this Agreement cover their prior oral contract and the new four (4) year term; (iii) compensate the Contractor in cash and in stock for consulting services rendered; and (iv) compensate the Contractor regularly and as agreed upon for its consulting services to be rendered in the new four (4) year term.

THEREFORE, in consideration of the mutual promises, undertakings and covenants set forth in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

A. <u>Term From Effective Date Through New Four (4) Year Term</u>. Phase I: September 23, 2002-September 23, 2003; and Phase II: September 23, 2003-September 23, 2007. This Agreement shall commence on the Effective Date set forth above, namely, September 23, 2002, and after the One (1) year initial term remain in effect for a new four (4) year term commencing on September 23, 2003 and extending to September 23, 2007. In order to avoid any confusion or misunderstanding in the Agreement any description or use of words, context, implication, application or tense shall mean and the parties hereby deem that the Agreement commenced on the Effective Date and that the Contractor provided its services from that date and not the date above on which this Agreement is entered into.

B. <u>Services.</u> The Contractor agrees to provide generally the services set forth below (the "Services") to the Client in accordance with this Agreement and its terms and conditions:

1. The Contractor agrees to provide marketing, communications, consulting project management services. This may include, but is not limited to, meetings, strategy and concept development, research, plan development, graphic design and production supervision, copywriting, proofreading, editorial services, collateral development, sales calls, account reviews, event planning, press interaction, and financial or market analysis as needed on a monthly basis.
2. The Client will reimburse the Contractor for reasonable and customary out-of-pocket expenses, including, but not limited to, phone charges, postage, business travel out of the Greater Boston Area and marketing materials. Expenses will be pre-approved and reimbursement will not be unreasonably withheld by the Client.
3. At the beginning of each month (or more frequently), the parties agree to exchange information about the status of current projects, tasks, activities and deadlines related to the services that the Contractor is providing to the Client.

C. <u>Compensation and Payment:</u> In consideration of the Services, the Client shall pay the Contractor the following fees:
   1. <u>Fees for Phase I September 23, 2002 to September 23, 2003</u>:
      a) For Phase I, the Client agrees that it owes and, therefore, agrees to pay the Contractor a fee at the rate of Seven Thousand Five Hundred Dollars ($7,500) per month or a total, for the twelve (12) month period, of Ninety Thousand Dollars ($90,000). In addition, the Client agrees that a part of the Phase I compensation includes the delivery and payment to the Contractor of a vested portion of a total of Five Percent (5%) of the common capital stock of the Client for Phase 1; and for Phase 2 a to be determined additional portion of the Client's common capital stock, provided, however, that the total amount of capital stock paid during Phase 1 and Phase 2 shall not be less than Five Percent (5%).
      b) The Client agrees to pay the Contractor the due and owing outstanding fee of Ninety Thousand Dollars ($90,000) for Phase 1 within one (1) day of receipt of funding or on October 31, 2003, whichever occurs first.
      c) The Contractor will receive the Five Percent (5%) stock for its Phase I and Phase 2 services; pursuant to a certain Shareholders' Agreement for the Contractor which is attached hereto and hereby incorporated herein, dated the ___ day of September, 2003. The stock will be issued and vested according to the so-called vesting period or schedule contained in the Stock Option Agreement, that is, 1.2% on or about September 23, 2003 and 3.8% ratably over Four (4) years commencing on September 23, 2003 and running through September 23, 2007.
      d) The said vesting period or schedule shall apply except in the case of the occurrence of one or more certain special events or matters some of which are touched on in Article 3 of the Shareholders' Agreement and more particularly defined in a schedule attached hereto and hereby incorporated herein (a "Cliff Event"); in such case of a Cliff Event the Contractor's unvested or scheduled shares of stock shall vest automatically and immediately without any action or notice required on the Contractor's part.
      e) The Contractor further understands that, in the case of a Cliff Event, the Contractor's services may no longer be required. In the case of a Cliff Event that involves bankruptcy or liquidation, the Client agrees to a buy out fee equivalent to two (2) months' fees as set forth in 2. below.

2. Fees for Phase II September 23, 2003 to September 23, 2007:
   a) The Contractor agrees to provide invoices covering its fees and expenses at the beginning of each month, commencing for the period September 23, 2003 through September 23, 2007. The first invoice will be presented October 1, 2003.
   b) The Client agrees to pay the Contractor a fee of Seven Thousand Dollars ($7,500) per month plus a to be determined amount of the common capital stock of the Client for Phase II of the project, provided, however, that the total amount of capital stock paid during Phase 1 and Phase 2 shall not be less than Five Percent (5%).
   c) The Contractor will receive the said stock pursuant to a certain Stock Option Agreement which will be created and, at that time, attached hereto and hereby incorporated herein. The Contractor will receive the stock according to the so-called vesting period or schedule therein.
   d) The Contractor's total equity compensation for successful completion of Phase 1 and aforesaid Phase 2 will at no time be less than 5% on a "fully diluted basis."
   e) The said vesting period or schedule shall apply except in the case of the occurrence of one or more certain special events or matters some of which are touched on in Article 3 of the Shareholders' Agreement and all of them defined in a schedule attached hereto and hereby incorporated herein (a "Cliff Event"); in such case of a Cliff Event the Contractor's unvested or scheduled shares of stock shall vest automatically and immediately without any action or notice required on the Contractor's part.
   f) The Contractor is entitled to participate in a bonus plan that will be the same or similar to that for other persons in the same or similar situation with the Client. The plan will be based on the Client's profitability and cash flow. The bonus will be paid on a frequent basis as defined in the bonus plan. The bonus plan will be developed on or before November 15, 2003.
   g) The Client agrees to pay the Contractor for services performed and business expenses within thirty (30) days of receipt of the Contractor's invoice.
   h) Except in the case of a Cliff Event or Buy Out, as above set forth, the Client may only terminate this Contract prior to its end date for good cause i.e., the Contractor's determined misfeasance, malfeasance or high moral turpitude or non-performance of consulting services. In the event of non-performance, and upon receiving written notice of the Client's intention to terminate then the Contractor will have a fair and reasonable opportunity to cure. If Contractor fails to cure after a 60 day period, Client may terminate this Contract and Contractor shall be entitled to the entire amount of stock vested as of the effective date of termination.

THE CLIENT AND THE CONTRACTOR HAVE READ AND AGREE TO BE BOUND BY THIS AGREEMENT, INCLUDING THIS COVER PAGE, THE ATTACHED TERMS AND CONDITIONS AND ALL EXHIBITS ATTACHED HERETO. CONTRACTOR HAS CAREFULLY READ THIS COVER PAGE, THE TERMS AND CONDITIONS AND ALL EXHIBITS ATTACHED HERETO, AND, HAVING DONE SO, AGREES THAT THE AGREEMENT IS FAIR AND REASONABLE.

| BLUE SAGE CONSULTING, INC. | FAILSAFE AIR SAFETY SYSTEMS, CORP. |
|---|---|
| Pamela Campagna | Paul Chirayath |
| By: _[signature]_ | By: _[signature]_ |
| Name: PAMELA CAMPAGNA | Name: Paul Chirayath |
| Title: PRESIDENT | Title: CEO |
| EFFECTIVE DATE: September 23, 2002 | EFFECTIVE DATE: September 23, 2002 |

BLUE SAGE CONSULTING, INC.
CONSULTING AGREEMENT
TERMS AND CONDITIONS

1. <u>Duties of Contractor.</u> The Contractor shall undertake and perform the Services in a professional manner. The Contractor shall devote such amount of the Contractor' time, as determined by the Contractor, as necessary to perform the Services. The Contractor shall retain the right to perform services for others during the term of this Agreement. All services provided by Contractor to clients of the Client shall be provided under this Agreement.

2. <u>Fees.</u> The Client shall pay the Contractor the fees set forth on the Cover Page. The Client agrees to pay a finance charge equal to one and one-half percent (1½%) per month on all amounts not paid when due and any collection costs (including reasonable attorneys' fees) incurred in collecting any unpaid amounts. Rates and fees are exclusive of all federal, state, municipal or other government excise, sales, use or like taxes now in force or enacted in the future. The Contractor acknowledges that the Contractor is fully responsible for the timely payment of these items and any other applicable self-employment taxes.

3. <u>Independent Contractor.</u> The Contractor shall at all times be an independent contractor hereunder, and not a co-venturer, agent, employee or representative of the Client, and no act, action or omission to act of the Contractor shall in any way be binding upon or obligate the Client. The Client will not supervise the Contractor as an employee of the Client would be, but the Contractor will report on its work periodically to the Client. The Contractor shall serve as a consultant to the Client and shall not have any authority in any other capacity, except as set forth in this Agreement.

4. <u>Term and Termination.</u> The Contractor's engagement hereunder shall commence as of the Effective Date and shall continue for the period of time as set forth on the Cover Page. The Contractor has the option to suspend performance of services hereunder, as noted above on the Cover Page, or it may terminate this Agreement at any time in the event that Client has not paid any fees or expenses owed to the Contractor hereunder. The Client may terminate this Agreement as set forth in section 2h above.

5. <u>Work Made for Hire.</u> The Contractor hereby agrees that all work, including developments, designs, inventions, improvements, trade secrets, trademarks, copyrightable subject matter or proprietary information which the Contractor makes or conceives, either solely by the Contractor or jointly with others and either on or off the Client's premises, relating to any actual or planned project service or activity of the Client of which the Contractor has knowledge or suggested by or resulting from any work performed by the Contractor for the Client (a "Development") shall be considered to be "work made for hire" under the U.S. Copyright Act, 17 U.S.C. §101 et seq. and shall be owned exclusively by the Client and, where applicable, any client of the Client for whom such work has been specifically performed. In the event that any such Development or portion thereof is not construed to be a work made for hire, the Contractor hereby assigns to the Client, and will in the future upon the Client's request, confirm such assignment to the Client, of all right, title and interest in such Development or portion thereof. The Contractor agrees that it has no proprietary interest in any Developments, including any patents, copyrights and trademarks and that the Contractor shall not register, file or obtain any patent, copyright or trademark relating to any of the Developments in its own name.

6. WARRANTIES; LIABILITIES. THE CLIENT ACKNOWLEDGES THAT THE CONTRACTOR DOES NOT MAKE ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER THE CONTRACTOR NOR ANY OF ITS EMPLOYEES OR AGENTS SHALL BE LIABLE TO CLIENT FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE OR INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT, REVENUE, GOODWILL, SAVINGS, BUSINESS OPPORTUNITY OF ANY KIND OR BUSINESS ADVANTAGE), WHETHER BASED UPON A CLAIM OR ACTION OF CONTRACT, TORT OR ANY OTHER LEGAL THEORY OR CAUSE OF ACTION, EVEN IF THE

CONTRACTOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE CONTRACTOR'S LIABILITY FOR ANY CAUSE (REGARDLESS OF THE FORM OF ACTION) UNDER OR RELATING TO THIS AGREEMENT, SHALL IN NO EVENT EXCEED $5,000.

7. <u>Indemnification.</u> The Client shall defend, indemnify and hold harmless the Contractor for any and all claims, damages, costs, expenses or actions arising out of this Agreement, except for the willful misconduct or gross negligence of the Contractor directly related to the Contractor providing services to the Client. The Contractor shall defend, indemnify and hold harmless the Client for any and all claims, damages, costs, expenses or actions arising out of this Agreement, except for the willful misconduct or gross negligence of the Client directly related to the Contractor providing services to the Client.

8. <u>Miscellaneous.</u> This Agreement contains the entire agreement and understanding by and between the Client and the Contractor with respect to the subject matter hereof, and no representations, promises, agreements or understandings, written or oral, not herein contained or incorporated herein by specific reference thereto shall be of any force and effect. The Contractor shall not be obligated to provide the Services or be liable to the Client for any failure or delay in providing the Services caused by events beyond Contractor's reasonable control. This Agreement shall be governed by, subject to, and interpreted in accordance with the laws of the Commonwealth of Massachusetts, Commonwealth of Massachusetts, without giving effect to its principles of conflicts of laws. In the event any provision hereof shall be deemed invalid or unenforceable by any court or governmental agency, such provision shall be deemed severed from this Agreement and replaced by a valid provision which approximates as closely as possible the intent of the parties, and all remaining provisions shall remain in full force and effect. No change or modification hereof shall be valid or binding unless the same is in writing and signed by both the Contractor and the Client. No waiver of any provision of this Agreement shall be valid unless the same is in writing, and no waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement at such time or shall be deemed a valid waiver of such provision at any other time. The headings and other captions in this Agreement are for convenience and reference only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement.

## SCHEDULE A

I.  MATTERS REQUIRING A SPECIAL VOTE

   <u>Special Vote Matters</u>.

   i. Notwithstanding anything to the contrary contained herein, in addition to any other approval required by law or pursuant to the governing documents or resolutions of the Company, the parties hereby agree that none of the following matters shall be effected without the prior approval of (I) a majority of the Directors which shall include at least one (1) Chirayath Director and the Therasyn Director, and to the extent shareholder approval is required under Delaware law (ii) the affirmative vote of 75% of the then issued and outstanding Shares:

   ii. any sale, lease or exchange or other disposition of more than 5% of the consolidated net assets of the Company as set forth in its most recent audited financial statements;

   iii. any merger of the Company or any Subsidiary of the Company or its consolidation or amalgamation with or into another entity, unless that other entity is the Company or a wholly-owned Subsidiary of the Company;

   iv. any sale, lease or exchange or other disposition of any of the Company's interests in any Subsidiary;

   v. except as otherwise required by applicable law, any declaration of bankruptcy or insolvency of the Company or the filing of any proposal or plan of arrangement or suspension of payment or reorganization or restructuring or merger or dissolution under corporate legislation or under any legislation providing protection or relief of debtors from their creditors in general;

   vi. except as otherwise required by applicable law, the adoption, repeal, or modification of the governing documents of the Company or any Subsidiary of the Company or the taking of any action in respect thereof which in either event would materially adversely affect the Therasyn Interests in the Company;

   vii. the incurrence of indebtedness by the Company or any Subsidiary of the Company in excess of an aggregate of $500,000 in any 12-month period; *provided, however*, that this paragraph 3(vi) shall not apply to the incurrence of non-recourse indebtedness by the Company or any Subsidiary of the Company on a project basis;

   viii. the making of any agreement or arrangement or the entering into of any transaction between the Company or any Subsidiary of the Company and a party hereto or an Affiliate of a party hereto involving more than $500,000 in any 12-month period;

   ix. the entering into of any agreement, action, arrangement or transaction by the Company or any Subsidiary of the Company neither in the ordinary course of business nor at arms' length;

x.   the entering into of any derivative agreement by the Company or any Subsidiary of the Company (except non-speculative derivative agreements solely for hedging purposes);

xi.  the entering into of any agreement, action, arrangement or transaction relating directly to the list of services set forth in Article III(a) of the Stock Purchase Agreement;

xii. the issuance of any capital stock of the Company, or securities convertible, exchangeable or exercisable into shares of capital stock of the Company, on parity or senior to the Common Stock (with respect to this paragraph 3(xi)), the Therasyn Director or Therasyn Interests shall not withhold its or their consent, as the case may be, to such issuance if (A) the pre-money valuation for the purchase price of such capital stock is more than Sixteen Million Six Hundred Sixty-Seven Thousand Dollars ($16,667,000), (B) the economic impact of such issuance under the documents related thereto is substantially similar for the Chirayath Interests and the Therasyn Interests, (C) preemptive rights on the same or better terms are offered to the Therasyn Interests and (D) the Therasyn Director has no bona fide fiduciary duty (to the extent Therasyn Director's consent is pertinent); or

xiii. the dissolution or liquidation of the Company.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) **BLUE SAGE CONSULTING INC.**
   v. **FAILSAFE AIR SAFETY SYSTEMS CORP.**

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   ___ I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   ___ II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

   ✓ III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,    **05  11483  NG**
             380, 385, 450, 891.

   ___ IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   ___ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   **N/A**

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐    NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐    NO ☑

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐    Central Division ☐    Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☑    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐    NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME **Robert N. Wilson Jr. Esq.    BBO # 558374**
ADDRESS **46 Washington Street, PO Box 633 Ayer MA 01432-0633**
TELEPHONE NO. **978-792-9014    atty@wilsonatlaw.com**

(CategoryForm.wpd -5/2/05)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Blue Sage Consulting, Inc.

**DEFENDANTS**
Failsafe Air Safety Systems, Corp.

(b) County of Residence of First Listed Plaintiff **Middlesex**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Law Offices of Robert N. Wilson Jr.
46 Washington St. Ayer MA 01432, (978) 772-9014

Attorneys (If Known)

**05   11483   NG**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | / ☐ 365 Personal Injury - Product Liability |  | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|  | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health |  | ☐ 490 Cable/Sat TV |
|  | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) |  |
| ☒ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  |  | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land |  | **Habeas Corpus:** ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act |  |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  |  |
|  | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): **28 USC §1332**
Brief description of cause: **Breach of Contract/Covenant of Good Faith**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ **1,406,040.00**   CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)   JUDGE _____   DOCKET NUMBER _____

DATE **July 11, 2005**
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

EXHIBIT B



September 8, 2004

Dear Paul,

I am in receipt of your email dated September 2, 2004 and I have to say that I am shocked by its tone and implication given that over the last 24 months, I have consistently provided exemplary consulting services. What started out as a 90-day marketing project turned into the launching of a company, its products and its place in the market. I am pleased with the significant contribution I have made in building this company.

During the past several months, I have attempted to figure out a way to both continue working with FailSafe – despite the huge debt owed to me by the company and the grave financial and business condition of the company – and maintain my consulting practice. In order to accomplish this, I restated the terms of our original Agreement, including the fact that I retain the right to perform services for others during the term of the Agreement.

I have undertaken activities (such as direct sales) that are beyond the scope of my Contractor Agreement. I have traveled tens of thousands of miles in support of FailSafe activities. I have floated tens of thousands of dollars for months on end to pay for FailSafe business expenses (and those of its Contractors). As you have said yourself, the level of commitment and professionalism has been unquestionable.

While I understand your situation, I have attempted to provide as much flexibility as possible. Unfortunately, you have been uncooperative and now, I have no choice but to terminate the Contractor Agreement as a result of nonpayment of fees, pursuant to section 4 of the Terms and Conditions of this agreement.

To date, I am owed $97,500 (plus accrued interest) for marketing, consulting and project management services. In addition, as I have acted outside the scope of this agreement by selling FailSafe products directly to customers, I am owed the customary 15% commission on the net invoice price that FailSafe pays to its Manufacturers Representatives. Assuming that the latest deal I closed last week is shipped, I will have sold more than $145,000 in FailSafe products. I am requesting this outstanding commission as well.

I have asked repeatedly, as have other shareholders, for issuance of stock certificates. To date, my requests have been ignored. I hereby request the issuance of stock certificates for the currently vested shares held in the name of Blue Sage Consulting, Inc.

Finally, according to my Agreement, the vesting period of my stock shall apply except in the case of the occurrence of one of more certain special events (a "Cliff Event"). "...in such case of a Cliff Event the contractor's unvested or scheduled shares of stock shall vest automatically and immediately without any action or notice required on the Contractor's part." Over the past several months, I have been made aware of business transactions that constitute Cliff Events and therefore, the automatic vesting of my ownership in FailSafe.

Kindly remove my name from the FailSafe website and any and all materials, correspondence, discussions and documents including, but not limited to: investor overviews, marketing plans, customer quotes, customer correspondence, event contacts, government and agency contacts, including GSA and VA.

I will look forward to being kept apprised of the status of the company as I will continue to track my stock ownership. Good luck to you, Paul.


Sincerely,



Pamela Campagna
Blue Sage Consulting, Inc.



Cc:
Alan Feuerstein, Esq.
Eliot Lazar, MD
Jerry Schentag, PhD
Vince Tracey